Christopher Sproul (State Bar No. 126398)
Stuart Wilcox (State Bar No. 327726)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Emails:  csproul@enviroadvocates.com
wilcox@enviroadvocates.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CRESCENT CITY, CALIFORNIA,<br><br>Defendant. | Civil Case No. 25-cv-4266<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et. seq.*) |

Ecological Rights Foundation ("EcoRights" or "Plaintiff"), by and through its counsel, hereby alleges:

## I. INTRODUCTION

1. This Complaint seeks relief for unlawful discharges of pollutants by the City of Crescent City, California ("Crescent City" or "Defendant") from its municipal separate storm sewer system ("the MS4") into waters of the United States. These discharges are in violation of the Federal Water Pollution Control Act, 33 U.S.C. sections 1251, *et seq*. (the "Clean Water Act" or the "CWA") and the State of California's National Pollutant Discharge Elimination System ("NPDES") General Permit for Waste Discharge Requirements ("WDRs") for Storm Water Discharges From Small Municipal Separate Storm Sewer Systems ("MS4s") Water Quality ("WQ") Order 2013-0001-DWQ NPDES NO. CAS000004, As Amended by Order WQ 2015-0133-EXEC, Order WQ 2016-0069-EXEC, WQ Order 2017-XXXX-DWQ, Order WQ 2018-0001-EXEC, and Order WQ 2018-0007-EXEC ("Small MS4 General Permit").

2. This Complaint also seeks relief for Crescent City's violations of the Resource Conservation and Recovery Act ("RCRA") related to its MS4 and activities that add pollutants to its MS4 that cause or contribute to an imminent and substantial endangerment to health or the environment caused by the handling, storage, treatment, transportation, or disposal of solid or hazardous wastes in violation of RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

3. Discharges from the MS4 cause significant, cumulative impacts to the water quality of Elk Creek in Crescent City, California, including its estuary and tributaries ("Elk Creek"); Marhoffer Creek; Lake Earl and its tributaries; Lake Talawa (note that Lake Talawa is sometimes called Lake Tolowa and that any references to Lake Talawa include Lake Tolowa, and vice versa) and its estuary and tributaries; wetlands, streams, and other waters in and near the Lake Earl Wildlife Area, which surrounds Lake Earl and Lake Talawa; wetlands, streams, and other waters in and near Tolowa Dunes State Park; Talawa Slough (note that Talawa Slough is sometimes called Tolowa Slough and that any references to Talawa Slough include Tolowa Slough, and vice versa); Dead Lake; the Smith River; nearby groundwater; the Elk Creek Wetlands Wildlife Area; Crescent City Harbor; the Pacific Ocean in and around Crescent City; and/or the valuable riparian, wetland, and/or shore waters adjacent to such

waters (collectively "Receiving Waters"). With every rainfall event, millions of gallons of polluted rainwater flow off of local industrial facilities and other areas and pour into the MS4 and the Receiving Waters.

4. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering the aquatic environment each year.

5. Storm water discharged from the MS4 in combination with other sources of runoff is causing or risking harm to humans and aquatic life and is causing or contributing to an imminent and substantial endangerment to health or the environment. On information and belief, the MS4 discharges contain many pollutants, including Dioxins[1]; various pesticides, including, but not limited to, pentachlorophenol, 2,4-D, chlordane, chlorpyrifos, and DDT; polychlorinated biphenyls ("PCBs"); copper; lead; zinc; lead; aluminum; iron; arsenic compounds; asbestos; various monocyclic aromatic hydrocarbons and polycyclic aromatic hydrocarbons, including, but not limited to, benzene, toluene, ethyl-benzene, and xylene; diesel fuel and gasoline; transmission fluid; engine coolant; motor oil; cadmium compounds; chromium compounds; bacteria; substances causing elevated chemical oxygen demand; suspended sediment; and dozens of additional pollutants in amounts that cause pollution of the Receiving Waters and/or pose an imminent and substantial endangerment to health or the environment.

6. These pollutants have served their intended purpose and are discarded solid and/or hazardous waste.

7. Dioxins are known carcinogens at extremely low doses and also cause dermal toxicity, immunotoxicity, birth defects, and other adverse effects on reproduction, development, and endocrine function.

8. The immune system is a particularly vulnerable target for the toxicity of Dioxin-like compounds, including Dioxins. The ability of an animal to resist and/or control viral, bacterial, parasitic,

---

[1] "Dioxins" are a class of highly persistent chemicals made up of numerous polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans congeners, several of which have half-lives measured in decades.

and neoplastic diseases is determined by both nonspecific and specific immunological functions, which can be adversely affected by very low levels of Dioxin-like compounds in body tissues.

9.  As body burdens of Dioxin-like compounds increase, the probability and the severity, as well as the spectrum of human noncancer effects increase. Hence, any additional increase in body burden of Dioxin-like compounds increases the risk of harmful toxicological effects.

10. Due to their hydrophobic nature and resistance toward metabolism, Dioxins, when ingested, have been found to accumulate in fatty tissues of animals and humans. Due to the Dioxins' persistence in the fatty tissues of the host organism, contaminants in the host will ultimately be passed on to upper trophic level species through bioaccumulation and biomagnification. This bio-magnified amount of toxins concentrated in fatty tissues and fluids is commonly referred to as the "body burden" of these chemicals. This places high trophic level predators like game fish, marine mammals, eagles, and humans that feed on the prey at the greatest risk.

11. In summary, exposure to Dioxins can increase the body burden of these chemicals, particularly in species like humans and other high trophic level species that are at the top of long food chains. Any increase in body burdens of these chemicals increases the risk of several toxic endpoints including cancer, developmental toxicity, reproductive toxicity, and immunotoxicity. Because of the present high body burdens of these compounds in humans and wildlife, any increment in dosage will generate an increased risk of toxicity. Because there is such a wide range of species of animals for which exposure to Dioxins-like compounds has been shown to disrupt prenatal development and to cause embryo/fetal mortality, exposure to Dioxins increases the risk of embryo/fetal mortality in fish, birds, and mammals. Exposure to Dioxins can increase the risk that humans and wildlife, including fish, birds, and mammals, will suffer decreased immune system function, and thus bear an increased risk that they will contract, or succumb to, viral, bacterial, parasitic, and neoplastic infections and diseases. As body burdens of these chemicals increase, so does the risk that all of the above-mentioned species will suffer the above referenced toxic endpoints.

12. The various pesticides above are well known to be toxic to the environment, which is why they were used as biocides. However, the use of these pesticides has largely been restricted or

banned because of the unintended toxicity on non-target species and because of their high levels of toxicity to humans and wildlife and their indiscriminate nature.

13. PCBs have been demonstrated to cause a variety of adverse health effects. They have been shown to cause cancer in animals as well as a number of serious non-cancer health effects in animals, including: effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. These health effects likely apply to humans as well.

14. Compounds containing copper are well known to be toxic to aquatic life. Indeed, pesticidal formulations using copper are specifically applied to areas where toxicity to aquatic life is intended, such as anti-fouling paints applied to floating vessels.

15. Lead exposure has been shown to cause a variety of health problems in both children and adults. These problems include brain damage, kidney damage, heart problems, reproductive problems, nerve disorders, cancer, developmental delay in children, anemia, and liver damage.

16. Zinc has been shown to be toxic to fish, causing a variety of problems related to growth and development, cellular damage, immune system harm, and a variety of other effects that adversely impact the fishes' fitness and ability to survive and reproduce.

17. Arsenic can cause skin lesions and a variety of other ailments. EPA has determined that all forms of arsenic are a serious threat to human health. The U.S. Agency for Toxic Substances and Disease Registry ranked arsenic as number 1 in its 2001 Priority List of Hazardous Substances at Superfund sites. Arsenic is classified as a Group-A carcinogen. The greatest human health threat from arsenic is from contaminated groundwater.

18. Cadmium can cause various health problems, including cancer, kidney and lung damage, bone disease, and anemia. Arsenic causes a variety of harmful effects to the lungs, including lung cancer, asbestosis, mesothelioma, pleural plaques, and pleural thickening.

19. Monocyclic aromatic hydrocarbons and polycyclic aromatic hydrocarbons cause significant harm in the form of cancer, blood disorders, kidney and liver damage, harm to the immune system, skin irritation, cataracts, reproductive and developmental harm, reduced lung function, and cardiovascular disease.

20. Chemical oxygen demand is a measure of the amount of oxygen needed to break down organic and inorganic compounds in water. When chemical oxygen demand is elevated by the presence of pollutants it decreases the available oxygen in the body of water, removing oxygen that is necessary to the survival and wellbeing of aquatic life therein.

21. Hexavalent chromium is toxic and carcinogenic (IARC Group 1) and exposure to hexavalent chromium is associated with a variety of health issues.

22. Bacteria, including coliform bacteria, can cause a variety of ailments with effects including diarrhea, vomiting, cramps, nausea, headaches, fever, fatigue, and death.

23. Diesel fuel, gasoline, transmission fluid, engine coolant, and motor oil can create a slick on the surface of contaminated water and can get into soil and permeate into groundwater. These compounds can harm wildlife by creating a film on the water surface that suffocates species, damages feathers and fur, hinders their ability to fly and regulate body temperature, and poisoning those species. These compounds are also toxic to humans and can disrupt ecosystems by killing plant life, invertebrates, and other ecosystem components that are vital to ecosystem fitness. Further, many of these pollutants also bio-magnify, which will increase their concentrations, and consequently the threat posed by the pollutants, in higher trophic level species.

24. While some of the above information focuses on harms to humans or wildlife, EcoRights alleges that all of the Wastes are harmful to both humans and wildlife.

25. The MS4 discharges also contain substances that affect the pH of the storm water and receiving waters. Increases or decreases in pH can harm aquatic life and can render their habitat less suitable or unsuitable.

26. The MS4 discharges further contains high concentrations of total suspended solids ("TSS"). High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to

aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

27. The MS4's illicit discharges contribute to the ongoing storm water pollution problem. These pollution discharges can and must be curtailed for the Receiving Waters to be restored to ecological health.

28. Crescent City is in violation of RCRA as a result of its past and present handling, storage, treatment, transportation, and/or disposal of solid or hazardous waste from and into the MS4 and sewage collection system in a manner which may present an imminent and substantial endangerment to health or the environment.

## II. JURISDICTION AND VENUE

29. This is a civil suit brought under the citizen suit enforcement provisions of the CWA and RCRA. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1); RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B); and 28 U.S.C. § 1331 (an action for declaratory, injunctive, and other relief arising under the laws of the United States).

30. EcoRights served the citizen suit notice letter and supporting documentation outlining Crescent City's CWA violations that form the basis of this lawsuit and providing all legally required information on or about October 28, 2024. The recipients included the required recipients under the CWA and its implementing regulations: Crescent City (served on Crescent City officials), the Administrator of the Environmental Protection Agency ("EPA"), the EPA Region IX Regional Administrator, the California State Water Resources Control Board, and the Attorney General. 40 C.F.R. § 135.2; *see also* 33 U.S.C. § 1365(b)(1)(A). These recipients are deemed to have received notice on the postmark date, *i.e.,* on or about October 28, 2024. See 40 C.F.R. § 135.2(c).

31. More than sixty days have elapsed since EcoRights gave notice of the CWA claims in this lawsuit to Crescent City and the relevant state and federal agencies. Neither EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint, and no claim in this action is barred by any prior administrative action pursuant to

section 309(g) of the CWA, 33 U.S.C. § 1319(g).

32. EcoRights served the citizen suit notice letter and supporting documentation outlining Crescent City's RCRA violations that form the basis of this lawsuit and providing all legally required information on all legally required entities by February 10, 2025. *See* 40 C.F.R. § 254.2(a)(1), (c).

33. More than ninety days have elapsed since EcoRights gave notice of the RCRA claims in this lawsuit to Crescent City and the relevant state and federal agencies. Neither EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint, and no claim in this action is barred by any prior administrative action.

34. Venue is proper in the Northern District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), and RCRA section 7002(a)(2), 42 U.S.C. § 6972(a)(2), because the source of the violations is located within this judicial district.

### III. PARTIES

35. EcoRights is a non-profit public benefit corporation with an office in Blocksburg, California and members throughout California, including in and/or around Crescent City, California. Among other work it does, EcoRights focuses on protecting surface waters and groundwater from pollution and degradation. EcoRights represents citizens who are striving to protect soil and waterways from pollution and secure the multitude of public and private benefits that follow from clean soil and from pure water: reduced incidences of cancer and birth defects; safe drinking water; abundant and diverse wildlife populations; healthy recreational opportunities; food uncontaminated by toxic chemicals; economic prosperity from commercial, sport, and subsistence fishing; and other recreational, spiritual, and commercial activities that depend on clean soil and pure water. In particular, EcoRights has worked for decades to prevent Dioxins pollution.

36. EcoRights' members, employees, and volunteers have been injured by Crescent City's actions. EcoRights' members, employees, and volunteers live and/or recreate in proximity to the MS4's discharge locations. EcoRights' members, employees, and volunteers use and enjoy the waters, wildlife, and other natural resources that are adversely impacted and endangered by Crescent City's discharges of contaminated storm water runoff from the MS4 for various recreational, educational, aesthetic,

scientific, and spiritual purposes, including but not limited to fishing, swimming, hiking, surfing, and enjoying birds, fish, and other wildlife. Crescent City's actions cause these individuals to suffer injury in fact to these interests. The harmed resources include, but are not limited to, the Receiving Waters, lands adjacent to the Receiving Waters, and those species that occupy, use, migrate through, reside, breed, and/or forage in and/or around these waters and/or natural resources, including but not limited to Coho salmon, coastal cutthroat trout, and other fish and wildlife species. This also includes, but is not limited to, all waters and natural resources proximate thereto (such as adjacent or nearby wetlands, hiking trails, beaches, preserves, parks, and the like), and including those species of plants and animals that occupy, use, migrate through, reside, breed, and/or forage in and around these waters and natural resources. The species harmed by Crescent City's actions include various species of terrestrial wildlife (including Roosevelt elk), aquatic wildlife, migratory and non-migratory birds, native fish, crustaceans, benthic organisms, and various species listed under the Endangered Species Act ("ESA") and their designated critical habitats. This includes, but is not limited to, harm to critical habitat for the green sturgeon (*Acipenser medirostris*) (Southern Distinct Population Segment ("DPS") – threatened), orca (*Orcinus orca*) (Southern Resident DPS – endangered), tidewater goby (endangered), and Western snowy plover (threatened) and harm to Hawaiian petrel (*Pterodroma sandwichensis* – endangered), marbled murrelet (*Brachyramphus marmoratus* – threatened), Northern spotted owl (*Strix occidentalis caurina* – Threatened), short-tailed albatross (*Phoebastria* (=*Diomedea*) *albatrus* – endangered), Western snowy plover (*Charadrius nivosus nivosus* – threatened), yellow-billed cuckoo (*Coccyzus americanus* – threatened), tidewater goby (*Eucyclogobius newberryi* – endangered), Western lily (*Lilium occidentale* – endangered), Pacific marten, Coastal DPS (threatened); Northwestern pond turtle (proposed listing as threatened); monarch butterfly (candidate species under the ESA); Oregon silverspot butterfly (threatened); hundreds of migratory and non-migratory bird species, many of which are state species of special concern; cutthroat trout; steelhead; coastal black-tailed deer; beaver; and many other fish and wildlife species. This also includes harm to other animals higher up the food chain that feed on contaminated benthic organisms and other animals and animals that feed on those animals, including, but not limited to, marine mammals and sharks, as well as humans who eat contaminated fish,

crustaceans, or shellfish. Humans, including EcoRights' members, may also be harmed when exposed to contaminated water or sediments during water contact activities and when they come into contact with contaminated water and sediments during their daily activities or otherwise. EcoRights' members', employees', and volunteers' use and enjoyment of these waters, species, and other natural resources is injured by, and is at an increased risk and threat of injury by, the ongoing violations of the CWA and RCRA set forth herein.

37.  Defendant Crescent City is the owner and operator of the MS4.

## IV. REGULATORY BACKGROUND

### Clean Water Act

38.  CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

39.  CWA section 402(p)(2), 33 U.S.C. § 1342(p)(2), requires that the U.S. Environmental Protection Agency ("EPA") promulgate regulations setting forth National Pollutant Discharge Elimination System ("NPDES") permit application requirements for (1) storm water discharges associated with industrial activity, including constructions sites covering over 5 acres of land ("Industrial Discharges"); (2) discharges from a municipal separate storm sewer system ("MS4") serving a population of 250,000 or more ("Large MS4s"); (3) discharges from MS4s serving a population of 100,000 or more, but less than 250,000 ("Medium MS4s"); and discharges for which EPA or a state determines that the storm water discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

40.  EPA first promulgated its "Phase I" regulations implementing the CWA 402(p)(2) requirements on November 16, 1990, setting forth regulations addressing NPDES permitting of Industrial Discharges, Large MS4s, and Medium MS4s. 55 Fed. Reg. 47,990 (Nov. 16, 1990).

41.  CWA section 402(p)(6), 33 U.S.C. § 1342(p)(6), further requires EPA to issue regulations that designate, based on studies EPA has carried out, additional storm water discharges to

be regulated to protect water quality and to establish a comprehensive program to regulate such discharges.

42. EPA promulgated its "Phase II" regulations implementing the CWA 402(p)(6) requirements on December 8, 1999, setting forth regulations addressing NPDES permitting for (1) storm water discharges from MS4s serving less than 100,000 persons ("Small MS4s") and (2) construction sites that disturb one to five acres. 64 Fed. Reg. 68,722, 68,782 (Dec. 8, 1999).

43. Amongst other things, the Phase II regulations directed the states to create permitting regimes for Small MS4s, including by the use of "general permits" through which the Small MS4s can apply for a permit with general terms applicable to Small MS4s rather than having to apply for and be granted an individual permit. *Id.* at 68,737. The goal of these general permits is to "reduce[] the administrative burden on permitting authorities, while also limiting the paperwork burden on regulated parties seeking permit authorization." *Id.* The State of California promulgated the Small MS4 General Permit to provide a general permit under which Small MS4s in California can gain NPDES permit coverage without needing to apply for an individual permit.

44. The Phase II regulations allow for waivers of certain permit requirements for certain Small MS4s. 40 C.F.R. § 123.35(d); 64 Fed. Reg. at 68,736. However, where a state waives some of the permit requirements for a Small MS4, the state "must periodically review any waivers granted in accordance with [the Phase II regulations] to determine whether any of the information required for granting the waiver has changed. At a minimum, [the state] must conduct such a review once every five years." 40 C.F.R. § 123.35(d)(6).

45. CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the California State Water Resources Control Board ("State Board") and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various individual sources and categories of dischargers.

46. CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and

for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see also* 33 U.S.C. § 1362(5).

47. CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $68,445 per day per violation. *See* 33 U.S.C. § 1319(d) (CWA § 309(d)); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

**The Small MS4 General Permit**

48. In California, subject to the Phase II regulations, the State Board has elected to issue a single, statewide general permit applicable to all storm water discharges from small MS4 systems. The Small MS4 General Permit is a NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p), the current version of which took effect on July 1, 2013. To discharge storm water from a small MS4 lawfully in California, dischargers must secure coverage under the Small MS4 General Permit and comply with its terms or obtain and comply with an individual NPDES permit.

49. It is unlawful to discharge pollutants to waters of the United States, such as the Receiving Waters, without an NPDES permit or in violation of the terms and conditions of an NPDES permit.

50. Crescent City has been enrolled under the Small MS4 General Permit since at least June 15, 2017, when the State Board and Regional Board received Crescent City's most recent Notice of Intent to be authorized to discharge storm water from the MS4. Further, Crescent City is included in the Small MS4 General Permit's Traditional Small MS4 List covered by the Permit. Small MS4 General Permit, Attachment A. Thus, at all relevant times, Crescent City has been a permittee subject to the Small MS4 General Permit's requirements.[2]

51. Other than coverage under the Small MS4 General Permit, Crescent City lacks NPDES permit authorization for any storm water discharges from the MS4.

**Resource Conservation and Recovery Act**

---

[2] Crescent City has never obtained a waiver of any of the Small MS4 General Permit's requirements, but Crescent City has nonetheless taken the position that it has a waiver of the Small MS4 General Permit's requirements and has failed to comply with the Small MS4 General Permit's requirements at all relevant times.

52. RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), prohibits any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, from contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

## V. STATEMENT OF FACTS

53. Crescent City owns and/or operates the MS4 in and around Crescent City itself. The MS4 systems collects, gathers, transfers, and discharges storm water from areas in and around Crescent City into various waters, including but not limited to, the Receiving Waters.

54. The Receiving Waters are all waters of the United States for CWA purposes.

55. Numerous publicly available documents within the Storm Water Multiple Application & Reporting Tracking System ("SMARTS") database identify Crescent City as the responsible party for the MS4.

56. Documents in SMARTS also indicate Crescent City's position that it has a waiver of certain of the Small MS4 General Permit's requirements. However, Crescent City has obtained no such waiver and has for years instead merely failed to comply with the requirements of the Small MS4 General Permit unilaterally.

57. Numerous pollutant-generating activities occur in Crescent City, California outdoors in uncovered areas exposed to rainfall and storm water runoff. Further, wastes that were generated indoors or in covered areas are subsequently transferred outdoors to uncovered areas. This results in contamination of storm water with pollutants that subsequently enter the Receiving Waters through the MS4.

58. The Small MS4 General Permit puts in place requirements for small MS4s, such as the MS4, to take a variety of actions to reduce storm water pollution and to gather and make public information regarding such pollution. By failing to comply with these various requirements, discussed below, Crescent City has caused more pollutants to be discharged from the MS4 into the Receiving Waters.

**Crescent City Activities Contributing to CWA Violations**

59. Pursuant to the Small MS4 General Permit, Crescent City is obligated to take a variety of actions related to the storm water discharges through the MS4. However, as discussed below, Crescent City has failed to take these actions.

60. Crescent City has not implemented BMPs that meet or exceed the Maximum Extent Practicable ("MEP") standard as required by Small MS4 General Permit § C.1 and Small MS4 General Permit Finding 36.

61. Each of the above requirements constitutes an "effluent standard or limitation" for purposes of CWA section 505(a)(1) and (f), 33 U.S.C. § 1365(a)(1), (f). *NW Env't Advocs. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("the plain language of [the CWA] authorizes citizens to enforce *all* permit conditions"). "Any [NPDES] permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41(a)(1) (applicable to federally-issued NPDES permits); *id*. § 123.25(a)(12) (incorporating this standard into state-issued NPDES permits, such as the Small MS4 General Permit). Further, Crescent City has discharged polluted storm water through the MS4 while violating each of these types of restrictions, thereby violating CWA section 301(a), 33 U.S.C. § 1311(a), and CWA section 402(p), 33 U.S.C. § 1342(p).

**Crescent City's Activities May Present an Imminent and Substantial Endangerment Under RCRA**

62. Numerous pollutant-generating activities occur in Crescent City outdoors in uncovered areas exposed to rainfall and storm water runoff, which creates solid or hazardous waste that is subject to RCRA.

63. Further, solid or hazardous wastes that were generated indoors or in covered areas are subsequently transferred outdoors to uncovered areas where they are exposed to rainfall and storm water runoff.

64. These indoor and outdoor activities are carried out in part on lands owned and/or operated by Crescent City and by individuals and/or entities employed and/or contracted for service by Crescent City.

65. These activities include, but are not limited to, activities carried out at Crescent City's corporation yard, located at 900 10th St. Crescent City, Calif. 95531 ("Corporation Yard").

66. Relevant activities include moving and storing raw materials and waste materials in a way that allows solid or hazardous waste from those materials, including the materials themselves when they are no longer capable of use or intended to be used, to enter the environment and be introduced into the MS4.

67. This also includes street sweeping, manually cleaning gutters, pressure washing gutters and drop inlets, and other activities related to the locations and structures that drain to the MS4 that mobilize solid or hazardous waste and pushes it into the MS4 or cause it, in whole or in part, to be introduced into the MS4 by any other means.

68. This also includes actions related to the operation and maintenance of the MS4, including, but not limited to, actions to remove blockages and flush solid or hazardous waste through the MS4 and replacing culverts and other parts of the MS4, which releases solid or hazardous waste that has built up in or around those items.

69. This also includes Crescent City's failure to adequately maintain the MS4, such as by failing to fix cracks, leaks, and other points of the MS4 that result in solid or hazardous waste discharging from the MS4 into the environment.

70. This also includes use of and maintenance of vehicles owned by Crescent City that leak fluids and deposit zinc and other materials on its Corporation Yard grounds.

71. All of the pollutants entering the environment because of these actions are solid and/or hazardous waste under RCRA. This deposition of pollution outdoors, or directly into the MS4, results in contamination of storm water with pollutants, which is also solid and/or hazardous waste under RCRA, that subsequently enter the environment through the MS4.

72. Humans, their pets, and wildlife come into direct and indirect contact with Crescent City's storm water, and the contaminated storm water is also tracked into nearby homes and businesses where humans and pets are further exposed to the contamination. In addition, this solid waste contaminates the MS4 itself, including soils and standing water, where humans as well as birds,

squirrels, gophers, insects, arachnids, centipedes, millipedes, snails, and/or other wildlife come into contact with, and may be harmed by, the contaminants. This contamination can further escape the MS4 when contaminated sediment and other solids contaminated are tracked off of the MS4 by vehicles, foot traffic, and/or in storm water and/or by wind, leaf blower, sweeping, powerwashing, and/or other natural or artificial processes that are designed to and/or do move material from one area to another. When these contaminated materials leave the MS4, they enter into the surrounding neighborhoods, businesses, natural areas, waters, and public rights of way and expose people, pets, and wildlife to this solid waste.

73. In these ways, Crescent City has contributed to, or is contributing to, the past or present handling, storage, treatment, transportation, and/or disposal of solid or hazardous waste under RCRA.

## FIRST CLAIM FOR RELIEF

### Discharges in Violation of Technology-Based Effluent Limitations

### (Violations of 33 U.S.C. § 1311)

74. EcoRights repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

75. The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The MS4 discharges storm water to the Receiving Waters, all of which are contaminated with pollutants. The MS4 discharges storm water pursuant to the Small MS4 General Permit, which authorizes these discharges conditioned on the MS4 complying with the terms of the Small MS4 General Permit. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). Crescent City's storm water discharges from the MS4 have violated numerous of these permit terms, thereby violating CWA effluent limitations.

76. The Small MS4 General Permit requires Crescent City to implement BMPs that meet or exceed the Maximum Extent Practicable ("MEP") standard. *See* Small MS4 General Permit § C.1; Small MS4 General Permit Finding 36.

77. On information and belief, Crescent City has failed to implement BMPs that constitute MEP for the MS4.

78. On every day since at least October 28, 2019, Crescent City has been discharging polluted stormwater from the MS4 in excess of MEP during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain). Significant local rain events are reflected in the rain gauge data available at https://www.ncdc.noaa.gov/cdo-web/search.

79. Further, failure to implement BMPs that comply with the MEP technology-based effluent limitation is a daily violation. Therefore, Crescent City has also been in daily and continuous violation of the MEP requirement referenced above for the MS4 on every day since at least October 28, 2019. Crescent City will continue to be in violation every day that it fails to bring itself into full compliance with the MEP requirement set forth above. Crescent City is subject to penalties for violations of the Small MS4 General Permit and the CWA occurring since at least October 28, 2019.

## SECOND CLAIM FOR RELIEF

**Failure to Gather and Use Information Necessary to Understand and to Control Storm Water Pollution in Its Jurisdiction**

**(Violations of 33 U.S.C. § 1311)**

80. EcoRights repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

81. Crescent City has violated, and is in ongoing violation, of the Small MS4 General Permit requirements relating to the gathering and use of information necessary to understand and control storm water pollution in its jurisdiction. Relevant requirements are as follows:

- Crescent City has not complied with the Small MS4 General Permit's requirements regarding creating and maintaining "an inventory of all industrial/commercial facilities/sources within [its] jurisdiction (regardless of ownership) that could discharge pollutants in storm water to the MS4" and to "utilize the inventory to identify facilities for inspections of potential illicit discharges" as required by Small MS4 General Permit § E.9.b.

- Crescent City has not complied with the Small MS4 General Permit's requirements to create and

maintain an inventory of all projects subject to the local construction site storm water runoff control ordinance within its jurisdiction that complies with the requirements of Small MS4 General Permit § E.10.a.

- Crescent City has not complied with the Small MS4 General Permit's requirements to develop and maintain an inventory of facilities it owns or operates within its jurisdiction that are a threat to water quality, a map of such facilities, and to conduct a comprehensive inspection and assessment of pollutant discharge potential and identification of pollutant hotspots as required by Small MS4 General Permit §§ E.11.a-c.

- Crescent City has not complied with the Small MS4 General Permit's requirements to carry out regular inspections of facilities that it owns or operates that meet the requirements of Small MS4 General Permit § E.11.e.

82. Every day since October 28, 2019 that Crescent City has failed to gather and use information necessary to understand and control storm water pollution in its jurisdiction is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

**THIRD CLAIM FOR RELIEF**

**Violation of the Resource Conservation and Recovery Act**

**(Violations of 42 U.S.C. § 6972(a)(1)(B))**

83. EcoRights repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

84. Through its operation and ownership of the MS4 and its other actions with regard to solid or hazardous wastes, Crescent City is a past and present generator of solid or hazardous waste. Crescent City has contributed and is contributing to the past and present handling, storage, treatment, transportation and disposal of solid or hazardous waste into, through, and from the MS4 in a manner that may present an imminent and substantial endangerment to health and the environment.

85. An action for relief against Crescent City for the imminent and substantial endangerment described in this Complaint is authorized by RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

1  Crescent City's acts and omissions that may be posing an imminent and substantial endangerment within
2  the meaning of RCRA section 7002(a)(1)(B), as alleged above, are continuing.
3       86.    Crescent City has remained in ongoing violation of these provisions since at least January
4  28, 2020.
5       87.    Continuing commission of the acts and omissions alleged in EcoRights' First through
6  Third Claims above will irreparably harm EcoRights' and its members, for which harm they have no
7  plain, speedy, or adequate remedy at law.

## RELIEF REQUESTED

Wherefore, EcoRights respectfully requests this Court to grant the following relief:

a. Declare Crescent City to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the MS4 in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and procedural requirements of the Small MS4 General Permit and the CWA;

b. Declare Crescent City to have violated and to be in violation of RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), for the past and present handling, storage, treatment, transportation and disposal of solid or hazardous waste with regard to the MS4 in a manner that may present an imminent and substantial endangerment to health and the environment;

c. Enjoin Crescent City from discharging pollutants from the MS4 to the Receiving Waters;

d. Enjoin Crescent City from violating the substantive and procedural requirements of the Small MS4 General Permit;

e. Enjoin Crescent City from the handling, storage, treatment, transportation and disposal of solid or hazardous waste with regard to the MS4 in a manner that may present an imminent and substantial endangerment to health and the environment;

f. Order Crescent City to pay civil penalties of up to $68,445 per day per violation. CWA § 309(d), 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation);

g. Award EcoRights its costs (including reasonable attorney, witness, and consultant fees)

as authorized by the CWA, 33 U.S.C. § 1365(d), and RCRA, 42 U.S.C. § 6972(e); and

    h.    Award such other relief as this Court may deem appropriate.

Dated: May 19, 2025            ENVIRONMENTAL ADVOCATES

                                            */s/ Stuart Wilcox*
                                            Stuart Wilcox
                                            Attorney for Plaintiff
                                            ECOLOGICAL RIGHTS FOUNDATION